Lisa Hay, OSB #980628
Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
Tel:    (503) 326-2123
Fax:    (503) 326-5524
lisa_hay@fd.org

Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:19-cr-00528-IM** |
| **Plaintiff,** | |
| | **MOTION TO DISMISS COUNTS 1-12 OF INDICTMENT** |
| **v.** | |
| **JAMES W. MILLEGAN,** | |
| **Defendant.** | |

# TABLE OF CONTENTS

PAGE

STATEMENT OF THE CASE.................................................................................. 1

STATUTORY BACKGROUND AND SUMMARY OF ARGUMENT ...................................... 1

ARGUMENT ................................................................................................... 5

    I.      The Indictment's Failure To Recite An Essential Element Of The Offense Is A Fatal Defect Requiring Dismissal. .......................................................... 5

    II.     Counts 1-12 Should Be Dismissed For Failure To Specifically Describe The Fraudulent Acts That Constitute The Offense In Violation Of The Sixth And Fifth Amendments And Rule 7 Of The Federal Rules Of Criminal Procedure.......................... 8

        A.     The Indictment Fails To Specify The Material Misstatements, Omissions, Or Schemes Alleged In Counts 1-12, Which Deprives Mr. Millegan Of Fair Notice And Impairs His Ability To Prepare His Defense. ....... 10

        B.     The Indictment's Lack Of Specificity Will Prevent The Court From Ensuring That Mr. Millegan Is Prosecuted Based On The Facts Presented To The Grand Jury. ........................................................................... 16

    III.    The Indictment Should Be Dismissed Because The Government's Reliance On Executive Branch Rule-Making Violates The Separation Of Powers. ...................... 19

        A.     The Separation of Powers Doctrine Protects Against Aggrandizement Of Power Within One Branch Of Government. ........................ 20

        B.     In 15 U.S.C. § 78j(b), Congress Directed The SEC To Identify Any Manipulative Or Deceptive Device Or Contrivance In Connection With The Purchase Or Sale Of Securities, But The SEC Did Not Promulgate A Rule Or Regulation Pursuant To That Authority With Respect To Churning. ............. 22

    IV.    The Indictment Must Be Dismissed Because The Charged Offense of "Churning" Is Unconstitutionally Vague and Prosecution For Such An Offense Would Violate Due Process. ........................................................................ 25

CONCLUSION ................................................................................................ 28

The defendant, James W. Millegan, through counsel, moves to dismiss counts 1-12 of the indictment under Federal Rule of Criminal Procedure 12(b)(3) and under the United States Constitution, on the grounds that the indictment for these counts (1) fails to state an offense because it lacks the essential elements of knowing actions and willfulness; and (2) lacks the specificity required by Federal Rule of Criminal Procedure 7 and the Sixth and Fifth Amendments. Independently, the counts should be dismissed because prosecution for the regulatory offense of "churning" implicates two core constitutional principles: the separation-of-powers principle that it is for Congress, and not the courts or executive branch, to enact federal criminal laws, and the due process prohibition on vague criminal statutes. Indictment for the judge-made or prosecutor-defined crime of "churning" violates both of these constitutional principles, requiring dismissal of these counts of the indictment.[1]

## STATEMENT OF THE CASE

Mr. Millegan is charged with 12 counts of violating of 15 U.S.C. § 78j(b) and Securities Exchange Commission (SEC) Rule 10-b5 through investment account churning ("churning"), and one count of Tax Evasion, in violation of 26 U.S.C. § 7201. Indictment, ECF No. 1, at 4, 5. Mr. Millegan was arraigned on the indictment on December 12, 2019. ECF No. 9. Trial is currently set for October 12, 2021. ECF No. 30.

## STATUTORY BACKGROUND AND SUMMARY OF ARGUMENT

The government indicted Mr. Millegan on the unusual theory that excessive trading, or "churning," of non-discretionary investment accounts, constitutes a federal crime subject to indictment under 15 U.S.C. § 78j(b). In that criminal statute, Congress made it an offense,

---

[1] A separate motion to dismiss based on irregularities in the grand jury proceedings will also be filed.

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Due to the breadth of the proscribed conduct – essentially any securities-related deception in violation of SEC rules – courts refer to this subsection as the "catch-all" fraud provision. *See, e.g., Chiarella v. United States*, 445 U.S. 222, 226 (1980) (referencing 10b-5 as a "catch-all").

The regulation promulgated by the SEC in response to this delegated authority also broadly proscribes fraud:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Neither the statute nor the related regulation refers to "churning" or excessive trading.

When the government indicted Mr. Millegan, it specified "churning" as the prohibited act that made Mr. Millegan culpable. The relevant section of the indictment, Counts 1-12, reads:

> Beginning and ending on or about the dates identified below, in the District of Oregon and elsewhere, defendant JAMES W. MILLEGAN, directly or indirectly, by the use of a means or instrumentality of interstate commerce, or of the mails, or of a facility of a national securities exchange: (a) employed a device, scheme, or

artifice to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in an act, practice, or course of business which operated as a fraud or deceit upon persons in connection with the purchase or sale of any security. *To wit, defendant MILLEGAN churned the investment accounts of the individuals identified below*.

\*\*\*

In violation of Title 15 United States Code§ 78j(b)); 17 CFR § 240.l0b-5; and Securities and Exchange Commission Rule 10-b5.

Indictment, ECF 1 (emphasis added).

Congress has not defined "churning" as a form of crime punishable under section 78j(b), nor is there a robust body of criminal law to define churning. In the context of private, civil actions that allege churning and seek monetary damages under SEC Rule 10b-5, courts have required plaintiffs to prove three elements to establish churning: the trading in the account was excessive in light of the customer's investment objective, the broker exercised control over the account, and the broker acted with intent to defraud or with willful or reckless disregard for the interests of the client. *Pits, Ltd. v. American Express Bank Intern*., 911 F. Supp. 710, 718 (S.D.N.Y. 1996); *see also Follansbee v. Davis, Skaggs & Co., Inc.*, 681 F.2d 673, 676 (9th Cir.1982) ("It is settled that when a broker, unfaithful to the trust of his customer, churns an account in the broker's control for the purpose of enhancing the broker's commission income and in disregard of the client's interest, there is a violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., and Securities and Exchange Commission Rule 10b-5."). Enforcement actions brought by the SEC against brokers rely on the same elements.

In listing the elements the government must prove to sustain a conviction for securities fraud under the charged statute, the Ninth Circuit's Model Jury Instructions refer to fraudulent devices but do not specifically address churning or excessive account trading as a form of fraud:

First, the defendant willfully [used a device or scheme to defraud someone] [made an untrue statement of a material fact] [failed to disclose a material fact that resulted in making the defendant's statements misleading] [engaged in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person];

Second, the defendant's [acts were undertaken] [statement was made] [failure to disclose was done] in connection with the [purchase] [sale] of [specify security];

Third, the defendant directly or indirectly used the [specify instrument or facility] in connection with [these acts] [making this statement] [this failure to disclose]; and

Fourth, the defendant acted knowingly.

Model Crim. Jury Instr. 9th Cir. 9.9 (2021). The instructions require that a defendant act knowingly and willfully.

In light of this statutory background, Counts 1-12 of the indictment are defective because they fail to include the required mental elements of knowing conduct and willfulness, which constitute the required scienter for a fraud prosecution under the charged statute. The failure to allege an element of a charged offense is a fundamental defect that renders the indictment constitutionally defective and requires dismissal.

Second, these counts of the indictment should be dismissed because they lack the specificity required by Rule 7 of the Federal Rules of Criminal Procedure and the Constitution. The government drafted the indictment with the assertion that Mr. Millegan "churned investment accounts" without providing the factual basis on which the grand jury could make that finding. No "churning" scheme is described. There are no assertions, for example, that Mr. Millegan exercised control over the accounts, or that the trades were excessive in light of the investment objectives of the customers, or, indeed, that excessive trading even occurred. Nor are the alleged misrepresentations or omissions specified. Because fraud allegations must be pled with specificity to meet the requirements of Rule 7 and the Fifth and Sixth Amendments, the allegations are

defective. The lack of specificity in the indictment deprives Mr. Millegan of fair notice of the charges to prepare his defense, and also deprives the Court of the means to assess, at trial, whether the government is proceeding on the theory presented to the grand jury. Continuing to trial on this defective indictment would be reversible error.

Third, the indictment should be dismissed because the charged offense violates Due Process and the separation-of-powers doctrine. The prosecution based on "churning" – outside a clear statute or regulatory definition – constitutes law-making so far removed from the legislative branch that it violates the separation of powers.

Fourth, the indictment should be dismissed because the charged offense is unconstitutionally vague in violation of Due Process. The amorphous, quasi-governmental standards to define churning preclude fair notice of what is considered a crime. Further, the vague definition of churning invites arbitrary enforcement.

## ARGUMENT

### I. The Indictment's Failure To Recite An Essential Element Of The Offense Is A Fatal Defect Requiring Dismissal.

When timely challenged before trial, "an indictment's complete failure to recite an essential element of the charged offense"—like the requisite mental state—"is not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment." *United States v. Du Bo*, 186 F.3d 1177, 1179-80 (9th Cir. 1999); *see also United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005) (indictment that failed to recite essential element of materiality required dismissal). Such a failure cannot be cured through jury instructions. *Du Bo*, 186 F.3d at 1179; *see also United States v. Qazi*, 975 F.3d 989, 994 (9th Cir. 2020) (the failure to include the "knowledge" element was a fatal flaw requiring dismissal when the indictment was challenged

pretrial). "Specifically, the 'failure to include the element of willfulness' . . . renders an indictment constitutionally defective." *Du Bo*, 186 F.3d at 1180 (citing *United States v. Kurka*, 818 F.2d 1427, 1431 (9th Cir. 1987)).

Indictments that are not challenged in a timely manner, on the other hand, are construed liberally and with a "common sense" reading. *United States v. Awad*, 551 F.3d 930, 936-37 (9th Cir. 2009); *see also United States v. Chesney*, 10 F.3d 641, 642-43 (9th Cir. 1993) (a challenge brought at the close of the government's case would be afforded a liberal construction). When a defendant challenges an indictment after the government's case or on appeal, the Ninth Circuit permits district courts to look to the facts alleged in the indictment to see if they were set forth with sufficient specificity to infer a missing mental state. *See Awad*, 551 F.3d at 936. The Ninth Circuit has, "however, continued to apply the central holding of *Du Bo* to dismiss indictments in the face of *timely* challenges." *United States v. Salazar-Lopez*, 506 F.3d 748, 753 (9th Cir. 2007) (emphasis added); *see also United States v. James*, 980 F.2d 1314, 1318 (9th Cir. 1992) (distinguishing between pre-trial and post-trial challenges to indictments and finding reversible error to proceed to trial on defective indictment). Because Mr. Millegan timely raises this challenge pretrial, his motion is governed by the *Du Bo* standard.

The Ninth Circuit's holding in *Du Bo* is directly analogous to this case. Mr. Du Bo was charged by indictment for violation of the Hobbs Act (18 U.S.C. § 1851). *Du Bo*, 186 F.3d at 1179. More than two months before trial, Mr. Du Bo unsuccessfully challenged the indictment as defective for failing to specify the necessary mens rea. *Id.* Even though criminal intent is not stated in the Hobbs Act itself, "acting 'knowingly or willingly'—is an implied and necessary element that the government must prove for a Hobbs Act conviction." *Id.* Therefore, the Ninth Circuit determined that the indictment was "on its face deficient." *Id.* Although the Ninth Circuit limited

its holding to those instances where the defendant properly challenges the indictment before trial, it held that harmless error review was not appropriate because the indictment, by missing an essential element, "fails to ensure that he was prosecuted only 'on the basis of the facts presented to the grand jury . . . ,'" as is required by the Fifth Amendment. *Id*. (quoting *United States v. Rosi*, 27 F.3d 409, 414 (9th Cir.1994)).

In this case, counts 1-12 of the indictment lack the essential elements of knowledge and willfulness. *See generally Borden v. United States*, 141 S. Ct. 1817, \*4 (2021) ("Purpose and knowledge are the most culpable levels in the criminal law's mental-state 'hierarchy.'" (citing *United States v. Bailey*, 444 U. S. 394, 404 (1980)). The charged counts incorporate previous paragraphs that contain no assertion of a mental state. *Supra* at 2 (ECF 1). Willfulness is nowhere included. Nor does the indictment even charge that the conduct was "knowing." The Ninth Circuit Model Criminal Jury Instructions make clear that knowledge and willfulness are required elements of offenses prosecuted as securities fraud. MODEL CRIM. JURY INSTR. 9TH CIR. 9.9 (2021) (defining "willfully," as "intentionally undertaking and act or making an untrue statement or failing to disclose for the wrongful purpose of defrauding or deceiving someone" and defining "knowingly" as "to make a statement or representation that is untrue and known to the defendant to be untrue," among other definitions); *see also United States v. Reyes*, 577 F.3d 1069, 1080 (9th Cir. 2009) (defining the required element of willfully in the context of securities fraud).

Because these essential mental state elements are not included in the indictment, and because Mr. Millegan makes this timely motion to challenge the indictment pretrial, the indictment is fatally flawed and should be dismissed. *Du Bo*, 186 F.3d at 1179; *Omer*, 395 F.3d at 1088 (reversing conviction after district court failed to dismiss an indictment that was timely challenged for failing to state a mental state); *Kurka*, 818 F.2d at 1431 (indictment should have been dismissed

that failed to allege damage to property was "willful"); *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979) ("The failure of an indictment to detail each element of the charged offense generally constitutes a fatal defect.").

## II. Counts 1-12 Should Be Dismissed For Failure To Specifically Describe The Fraudulent Acts That Constitute The Offense In Violation Of The Sixth And Fifth Amendments And Rule 7 Of The Federal Rules Of Criminal Procedure.

Rule 7 mandates that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). That requirement codifies and enforces "basic principles of fundamental fairness" inherent in the Sixth and Fifth Amendments. *Russell v. United States*, 369 U.S. 749, 763-66 (1962). To pass constitutional muster, an indictment must include a "description of the charges" sufficiently detailed to (1) "enable [the defendant] to prepare his defense," (2) "ensure that the defendant is prosecuted on the basis of facts presented to the grand jury," (3) "enable him to plead jeopardy against a later prosecution," and (4) "inform the court of the facts alleged so that it can determine the sufficiency of the charge." *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979); *see also Russell,* 369 U.S. at 764 (indictment must "sufficiently apprise the defendant of what he must be prepared to meet" (internal quotation marks omitted)); *Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge [is] among the constitutional rights of every accused in a criminal proceeding"); *Smith v. O'Grady*, 312 U.S. 329, 334 (1941) ("[R]eal notice of the true nature of the charge" is "the first and most universally recognized requirement of due process.").

The level of specificity required will depend on the nature of the crime charged. *United States v. Resendiz-Ponce*, 549 U.S. 102, 109  (2007) (reaffirming *Russell* and noting that "while an indictment parroting the language of a federal criminal statute is often sufficient, there are

crimes that must be charged with greater specificity"); *see also Hamling v. United States*, 418 U.S. 87, 118 (1974) (explaining *Russell* as holding that, "[w]here guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute" (internal quotation marks omitted)). "[F]or certain statutes, specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." *United States v. Stringer*, 730 F.3d 120, 126–27 (2d Cir. 2013) (identifying fraud cases, among others, as those requiring specificity).

Although the Ninth Circuit approves "bare-bones" pleadings in some contexts, *United States v. Woodruff*, 50 F.3d 673, 676 (9th Cir. 1995), consistent with other circuits, it has required greater specificity for fraud allegations. *See, e.g.*, *United States v. Charnay*, 537 F.2d 341, 352 (9th Cir. 1976) (agreeing that "an indictment under the wire fraud statute must 'set out clearly what the artifice was wherein the fraud consisted, and how it was to be accomplished'"); *United States v. Telink, Inc.*, 702 F. Supp. 805, 808 (S.D. Cal. 1988), aff'd, 910 F.2d 598 (9th Cir. 1990), and aff'd, 24 F.3d 42 (9th Cir. 1994) (dismissing indictment that suffered "fatal flaw" of lacking specificity in scheme to defraud).

Because the requirement of a specific indictment serves important constitutional purposes, "the indictment must be considered as it was actually drawn, not as it might have been drawn." *United States v. Pirro,* 212 F.3d 86, 92 (2d Cir. 2000). The indictment in this case comes nowhere close to providing Mr. Millegan with the fair notice and assurance of grand jury presentment required by the Constitution.

*The Indictment Fails To Specify The Material Misstatements, Omissions, Or Schemes Alleged In Counts 1-12, Which Deprives Mr. Millegan Of Fair Notice And Impairs His Ability To Prepare His Defense.*

JWMI was a brokerage company that operated in Oregon for over two decades, had over 250 clients, successfully bought and sold tens of thousands of securities for those clients, filed tax returns each year, and received audits by the Internal Revenue Service and FINRA. The government now alleges that twelve clients were defrauded during the last five years of the company's operation, when Mr. Millegan allegedly employed a scheme, device, or artifice to defraud, made untrue statements of material facts or material omissions, or engaged in an act, practice, or course of business that operated as a fraud, "to wit, [he] churned investment accounts." In laying out its theory of criminality, the government bears the burden to delineate the contours of the alleged fraud. Yet the factual allegations to demonstrate this alleged fraud are almost non-existent in this indictment. The single factual paragraph in the indictment describing the alleged fraudulent misrepresentations is a model of vagueness:

> 4. Defendant **JAMES W. MILLEGAN** usually contacted his clients by telephone to seek their permission to make trades in their accounts. During these telephone conversations with clients, defendant **MILLEGAN** directly or impliedly represented the trades would benefit the clients. These direct or implied representations were false because defendant **MILLEGAN** conducted these trades to benefit himself, not his clients. Defendant **MILLEGAN** also caused the clients to receive periodic account statements by mail.

Indictment, ECF 1. The indictment fails to specify a single one of these representations. It fails to give even approximate dates when the representations occurred, or to which clients they were made. The indictment fails to describe which of the many thousands of trades that Mr. Millegan recommended to his clients might be at issue, impairing the defense ability to research the advice

given, the client's objectives at the time, and the reason to believe the trade would be beneficial. Nor does it specify whether the pool is limited to the 12 clients listed in the later counts of the indictment, or whether Mr. Millegan's communications with all clients are at issue.

At the high level of generality at which the representations are presented—that Mr. Millegan generally represented "the trades would benefit the client,"—the defense cannot prepare a defense because the truthfulness of that statement depends on the individual goals and circumstances of each client and what Mr. Millegan believed at the time. The government alleges the statements were false, not by showing that the specific trades in fact did *not* benefit the clients, but instead by pointing to Mr. Millegan's motivation when making the trades. The lack of parallelism defeats the claim of falsity. One can sincerely believe a trade will benefit a client, and at the same time be motivated to conduct the trade to make money for oneself, not others. Brokers do this every day, trading not out of altruism but out of a profit motive. Because no specific representation is identified in the indictment, and no demonstration of the falsity of that representation is provided, the indictment is insufficient for Mr. Millegan to prepare a defense.

Further, paragraph 4 asserts that Mr. Millegan "*usually* contacted his clients . . . to seek permission to make trades." Indictment, ECF 1 (emphasis added). Is this an oblique assertion that in some instances Mr. Millegan fraudulently traded without permission? If the government intends to proceed on that theory, then the unauthorized trades should have been identified. Last, the paragraph advises that Mr. Millegan caused his clients "to receive periodic account statements." Is there an implied fraud, either an omission or a misstatement, involved with these account documents? Mr. Millegan should not be left guessing.

The discussion of "churning" in the indictment is equally flawed. In paragraph 5, the government offers a non-controversial statement about the lawful earning of commissions for

securities trades: the more trades a broker makes, the more commissions the broker receives. This is both true and legal. In paragraph 6, the government defines churning to occur when a broker engages in excessive trading of securities in a client's account "chiefly to generate commissions that benefit the securities broker, with no reasonable expectation the client will benefit from the trading." This definition leaves out critical elements required by the Ninth Circuit:

> (1) that the trading in [the] account was excessive in light of [the client's] investment objectives; (2) that the broker in question exercised control over the trading in the account; and (3) that the broker acted with the intent to defraud or with the willful and reckless disregard for the interests of his client.

*Mihara v. Dean Witter & Co., Inc.*, 619 F.2d 814, 821 (9th Cir. 1980). Although *Mihara* reviewed churning in the civil context, the Ninth Circuit has held that precedents addressing civil litigation under 10b-5 apply to criminal applications of the rule. *Charnay*, 537 F.2d at 348; *see generally SEC v. Joiner Corp.*, 320 U.S. 344, 355 (1943) (noting the primary difference between criminal and civil prosecutions under the securities laws is the burden of proof required for a verdict).

Unsurprisingly, given that the indictment did not cite these elements required by the Ninth Circuit, the indictment fails to specify facts that meet these elements. Instead, the indictment broadly and insufficiently defines "churning" and then says Mr. Millegan did it. Again, Mr. Millegan is left in the dark as to how to prepare to meet this accusation of churning. "Churning" is neither a legislatively defined crime, nor a common law offense. Reference to the amorphous concept of churning does not provide the requisite specificity. What is the standard for excessive trading that the government relies on in this indictment? What client investment objectives are at issue? What are the facts that demonstrate no expectation of client benefit? Is the dispute over the degree of control that exercised over the accounts?

Courts have repeatedly found indictments charging falsehoods insufficient for failure to specify what statement the defendant made or the respect in which the statement was allegedly false. In the seminal case *United States v. Nance*, 533 F.2d 699 (D.C. Cir. 1976) (per curiam), for example, several counts purported to charge violations of the District of Columbia false pretenses statute. Each of those counts alleged the date of the false representation, the name of the victim, and the amount of money the victim lost. *Id*. at 700 n.5. But those counts failed to identify the alleged representations or the respect in which they were false. *See id*. at 700. Citing *Russell v. United States*, 369 U.S. 749, 763-66 (1962), the court of appeals found the false pretenses counts insufficient and reversed the conviction on those counts. *See id*. at 701; *see also United States v. Williams*, 679 F.2d 504, 509 n.6 (5th Cir. 1982) (stating that, in a previous decision, the Fifth Circuit "noted that an indictment which alleges that the accused has obtained property under false pretenses must specifically allege the false representations made"); *United States v. Curtis*, 506 F.2d 985, 990 (10th Cir. 1974) (citations omitted) (dismissing mail fraud indictment that excludes false pretenses because "some substantial indication of the nature or character of any scheme or artifice to defraud, or to obtain money or property by means of false pretenses, representations or promises is requisite").

A comparison with the specificity provided in other fraud prosecutions helps illustrate the deficiency in this indictment. Although few criminal cases under 15 U.S.C. § 78j(b) have been prosecuted under this churning theory asserted by the government, many securities fraud cases under the same statute have been prosecuted. Attached as Exhibit 1 are two indictments filed in the Northern District of California alleging violation of this same statute and regulation, 15 U.S.C § 78j(b) and 17 C.F.R. 10b-5, for other forms of fraud. The contrast with this indictment is striking. Those indictments set out numerous specific representations, then also state why the

representations are false and misleading. The indictment in *United States v. Feathers*, 14-cr-531, for example, identifies the basis for a fiduciary duty (¶ 11); describes the offering materials and the representations in them (¶14); describes specific representations to investors about how the money would be used (¶¶18, 19); sets out the facts that are contrary to these representations (¶24); and describes the scheme to defraud by identifying acts that amount to a Ponzi scheme (¶¶26-27). The complete lack of specificity in the indictment against Mr. Millegan is made evident by this comparison.

As a second comparison, the charging document alleging churning from an SEC enforcement action in *SEC v. Dean & Fowler* is attached as Exhibit 2. Although this is an enforcement action as opposed to a criminal indictment, the exhibit demonstrates the specificity the SEC provides when alleging churning. The complaint alleges, as one example of improper trading:

> Dean and Fowler used the same basic strategy in the 27 customer accounts: the purchase of a stock followed by the sale of that stock within a week or two. The quick sales occurred regardless of price movements. This pattern of buys followed by sales repeated itself over and over in the accounts of their customers.

Ex. 2, ¶ 17. The complaint further describes the duty owed by the broker to customers and asserts that Dean and Fowler conducted almost "no due diligence" on their clients and therefore did not know their investment goals. *Id.* at ¶ 18.

Further, the SEC identified the deceptive scheme and described the mental state of the brokers:

> 27. Dean and Fowler pursued their high-cost, in-and-out trading strategy without having a reasonable basis for believing that this strategy was suitable for anyone.
>
> **
>
> 29. Dean and Fowler knew, or were reckless in not knowing, that repeated short-term buying and selling of securities was not in the best interests of their customers

and that the transaction costs would almost certainly outstrip any potential gains in
the accounts.

*Id.* at 20.  As for the element of excessive trading, the SEC set out the specific facts that support

the allegation. As one section of the description, the SEC identified the formulas used to conclude

the trading was excessive.

> 32. Turnover and cost-to-equity ratios are used to evaluate activity in brokerage
> accounts. Turnover is the number of times per year a customer's securities are
> replaced by new securities. The cost-to-equity ratio, also referred to as the break-
> even ratio, measures the amount an account has to appreciate annually just to cover
> commissions and other expenses.
>
> 33. A turnover of 6, or a cost-to-equity ratio in excess of 20%, is considered to be
> indicative of excessive trading.
>
> 34. The Attachment lists the turnover, cost-to-equity ratios, and other data
> regarding the 27 customer accounts. The turnover numbers are extremely high,
> ranging from 20.73 to 451.92, with rates for 9 accounts exceeding 100. The average
> turnover for the 27 customer accounts was 105.00.

*Id.*  In contrast, the indictment against Mr. Millegan neither states that he engaged in excessive

trading nor provides any formula to demonstrate how excessive trading was calculated.  Instead,

the indictment conclusively asserts that he "churned" investment accounts.

Finally, for the three alleged victims of the churning in *SEC v. Dean and Fowler*, the SEC

described the investment strategy of the customer; whether the brokers exercised de facto control

of the account and the facts supporting a claim of control (for example, whether the customers ever

disagreed with broker's recommendation); what the turnover and cost to equity ratio were for that

client; and what the account equity was at the time of the churning.  *Id.* at ¶¶ 41-47. In contrast, in

the indictment against Mr. Millegan, the client information states only the time period the account

was allegedly churned, and the collective loss for all 12 accounts. As a result of the lack of

specificity in the indictment, Mr. Millegan is deprived of fair notice.

In this case, the fraud allegations are so lacking in specificity that Mr. Millegan cannot prepare his defense. The counts should be dismissed.

B.    *The Indictment's Lack Of Specificity Will Prevent The Court From Ensuring That Mr. Millegan Is Prosecuted Based On The Facts Presented To The Grand Jury.*

The "most valuable function of the grand jury" is to stand between the prosecutor and the accused. *Hale v. Henkel*, 201 U.S. 43, 59 (1906). The grand jury was created specifically to check and constrain the power of both the prosecutor and the court by limiting what can be submitted for trial, conviction, and sentence. *Stirone v. United States*, 361 U.S. 212, 218 (1960). Indeed, the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. *In Ex parte Bain*, 121 U.S. 1, 12 (1887), the Supreme Court recognized the indispensable and critical role of a grand jury to serve as a check on prosecutorial power. *See also United States v. Cotton*, 535 U.S. 625, 634 (2002) (while failure to allege element is not jurisdictional, "the Fifth Amendment grand jury right serves a vital function in providing for a body of citizens that acts as a check on prosecutorial power.").

The Fifth Amendment's presentment provision also requires that the facts be elucidated sufficiently in the indictment so that the grand jury's finding of probable cause can be ascertained and to foreclose conviction based on any offense not found by the grand jury. *See Stirone*, 361 U.S. at 215-162 ("[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself."). Without specificity of charged conduct and circumstances, the court would be forced to "guess as to what was in the minds of the grand jury at the time they returned the indictment," and a defendant might be convicted "on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him." *Du Bo*, 186

F.3d at 1179 (quoting *Keith*, 605 F.2d at 464). Such a conviction "which would "deprive the defendant of a basic protection that the grand jury was designed to secure." *Du Bo*, 186 F.3d at 1179.

The important interplay of specificity in the indictment with grand jury presentment was most recently affirmed by the Supreme Court in *United States v. Resendiz-Ponce*, 549 U.S. 102, 109-10 (2007). While clarifying that simplified pleading has become the norm, the Court nevertheless affirmed the reasoning and requirement of specificity in *Russell*, noting that when guilt depends crucially "on specific identification of fact," an indictment "must do more than restate the language of the statute." *Id*. Like the false statement offense in *Russell*, a fraud offense based on alleged misrepresentation depends crucially on the factual context, which must be set out in the indictment. That specificity is crucial to "ensure that any conviction would arise out of the theory of guilt presented to the grand jury." *Id*. After an indictment has been returned, "its charges may not be broadened through amendment except by the grand jury itself." *Stirone,* 361 U.S. at 215-16.

In this case, the lack of specificity in the indictment will prevent this Court from ensuring that Mr. Millegan is tried on the theory of guilt presented to the grand jury. Only one general statement is attributed to Mr. Millegan in the indictment: that "the trades would benefit the clients." At trial, any presentation of other statements or alleged omissions would exceed the facts and theory presented to the grand jury, in violation of the Fifth Amendment. Similarly, because the indictment alleges that Mr. Millegan engaged in "churning," but without specifying either the calculations that demonstrate excessive trading or the client objectives that were disregarded, the Court will not be able to assess whether the theory of churning presented at trial is the same as

presented to the grand jury, which is especially important where divergent theories of churning are available.

The evidence and the theory presented to the grand jury matters. Once the indictment issues, "neither a prosecutor nor a judge can change the charging part of an indictment to suit [his or her] own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes." *United States v. Ward*, 747 F.3d 1184, 1189 (9th Cir. 2014) (reversing conviction because jury instruction constructively amended indictment by allowing conviction for conduct not charged); *United States v. Adams*, 778 F.2d 1117, 1124-25 (5th Cir. 1985) (where indictment alleged defendant falsely stated his name, and the jury instructions permitted conviction for a false statement of residence, the indictment was constructively amended and reversal was required).

The Ninth Circuit's decision in *United States v. Lindell*, 766 F. App'x 525, 529 (9th Cir. 2019), offers an example of what may occur if this case proceeds to trial on this flawed indictment. In *Lindell*, the defendants argued that the jury instructions constructively amended the indictment because they may have allowed the jury to convict based on a "fraudulent nondisclosure theory" that had not been charged in the indictment. The Court dismissed this concern, however, because the trial court had instructed the jury to "find the conduct charged in the indictment before it may convict." *Id*. (citation omitted). More specifically, "the court told the jury that it must find 'the charged scheme.'" *Id*. Given these jury instructions, the Ninth Circuit expressed confidence that "the jury convicted the [Defendants] based solely on the conduct actually charged in the indictment." *Id.*

A similar instruction in this case would be of no use, however, because no "scheme" is delineated in the indictment. The indictment does not allege that Mr. Millegan engaged in

excessive trading in securities; it does not describe his control over accounts; it does not state that he disregarded the investment objectives of his clients; it does not even assert that he knew his alleged statement – that a trade would benefit a client – was untrue when he made it. Because the indictment lacks specificity, directing the jury to review the indictment will not assure that Mr. Millegan is convicted on the facts and theory presented to the grand jury. For comparison with this indictment, a copy of the indictment in *Lindell* is included as Exhibit 3.

In short, the effect of the non-specific indictment is that the government could shift its theory at trial as the case progresses. The Fifth Amendment's presentment requirement would be a nullity if a vague indictment like this could support a criminal conviction. If a prosecutor were allowed to "fill in the gaps" of an insufficient indictment, "the role of the grand jury as intervenor would be circumvented." *Cecil*, 608 F.2d at 1296 (reversing conviction because fraud indictment failed to "allege sufficient facts to facilitate the proper preparation of a defense and to ensure that the defendants were prosecuted on facts presented to the Grand Jury"); *see also United States v. Keuylian*, 23 F. Supp. 3d 1126, 1128 (C.D. Cal. 2014) (citing *Cecil* and granting motion to dismiss fraud indictment that tracked statutory language but lacked sufficient factual description of conduct).

## III. The Indictment Should Be Dismissed Because The Government's Reliance On Executive Branch Rule-Making Violates The Separation Of Powers.

The constitutional separation of powers "flow[s] from the scheme of a tripartite government adopted in the Constitution[.]" *Stern v. Marshall*, 564 U.S. 462, 482-83 (2011). The creation and definition of crimes constitutes a core legislative function, with the role of the Executive Branch sharply limited to the execution of laws enacted by Congress. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019); 18 U.S.C. 4001(a) ("No citizen shall be imprisoned or

otherwise detained by the United States except pursuant to an Act of Congress."). "Under our Constitution, [o]nly the people's elected representatives in the legislature are authorized to 'make an act a crime.'" *Guedes v. BATFE*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in denial of writ of certiorari). Congress cannot delegate away this central constitutionally prescribed function. *Mistretta v. United States*, 488 U.S. 361, 371 (1989). Yet the federal crime of investment churning is not defined by Congress, which instead delegated rulemaking authority regarding securities fraud crimes to the SEC. And while federal courts have recognized a narrow exception to the nondelegation principle when Congress delegates well-defined matters to administrative agencies like the SEC, in this case, even the SEC does not define the crime of investment churning. Rather, the SEC re-delegated the relevant rulemaking authority to FINRA, a private nongovernmental self-regulatory agency, and the judiciary has filled in the gaps of what constitutes the relevant criminal conduct. In this context, the prosecution based on "churning" – outside a clear statute or regulatory definition – constitutes law-making so far removed from the legislative branch that it violates the separation of powers.

A.     *The Separation of Powers Doctrine Protects Against Aggrandizement Of Power Within One Branch Of Government.*

Article I of the Constitution vests all legislative powers in the Congress. U.S. Const., Art. I, § 1. From this language, the Supreme Court has derived the nondelegation doctrine: that Congress may not constitutionally delegate its legislative power to another branch of Government. *Touby v. United States*, 500 U.S. 160, 165 (1991). This nondelegation doctrine is "rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). The separation of powers prevents the aggrandizement of power within any single branch. *See I.N.S. v. Chadha*, 462 U.S. 919, 998 (1983) (noting "the

purpose of separating the authority of government is to prevent unnecessary and dangerous concentration of power in one branch").

Despite the nondelegation doctrine, Congress may seek assistance, "within proper limits," from the other branches of government when legislating. *Touby*, 500 U.S. at 165. With the expansion of administrative agencies, courts have permitted Congress to delegate rulemaking powers to agencies, provided the relevant statute contains "an intelligible principle to which . . . [an agency] is directed to conform." *Mistretta*, 488 U.S. at 372. That is, broadly worded directives to executive agencies are permissible if they provide sufficient guidance:

> Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors. So long as Congress "lay [s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power."

*Id*. (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)); *see also Mistretta*, 488 U.S. at 372-73 (noting it will be "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority"). When Congress seeks to delegate its power to enact criminal rules, even greater specificity in the delegation may be required. *See, e.g.*, *Touby*, 500 U.S. at 166 (questioning but not deciding whether greater specificity in delegation is required in the context of criminal sanctions*); United States v. Amirnazmi*, 645 F.3d 564, 576-77 (3d. Cir. 2011) (upholding a statute that delegated to the President authority to create criminal sanctions for certain exports because the delegation restricted the scope of exports covered, imposed a mens rea requirement, and otherwise "meaningfully constrain[ed]" the President's discretion); *United States v. Dhafir*, 461 F.3d 211, 216-17 (2d. Cir. 2006) (same). In this case, Congress not only broadly delegated criminal legislative authority to the SEC, but the SEC re-delegated this authority to FINRA and the

judiciary, removing the responsibility for defining the criminal conduct of "securities fraud" further and further from the legislative branch.

> B.    *In 15 U.S.C. § 78j(b), Congress Directed The SEC To Identify Any Manipulative Or Deceptive Device Or Contrivance In Connection With The Purchase Or Sale Of Securities, But The SEC Did Not Promulgate A Rule Or Regulation Pursuant To That Authority With Respect To Churning.*

In Section 10(b), Congress made it a criminal offense to use or employ "**any manipulative or deceptive device or contrivance** in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ." 15 U.S.C. § 78j(b) (emphasis added). The SEC, in response to this delegation of criminal rule making, promulgated 17 C.F.R. § 240.10b-5, which provides that it shall be unlawful for any person to "employ any **device, scheme, or artifice to defraud** . . . ." 17 C.F.R. § 240.10b-5 (emphasis added). Through this generalized regulation, the SEC did not apply its agency expertise to criminalize churning; this rule merely parrots the language of Section 10(b).

Instead, the judiciary, and a private regulatory entity—FINRA (the Financial Industry Regulatory Authority)—have filled in the gap that Congress acknowledged existed in 15 U.S.C. § 78j, in direct violation of the Constitution. In other words, the SEC has unconstitutionally re-delegated its rulemaking authority. FINRA is a private, nongovernmental organization that writes and enforces rules governing registered brokers and broker-dealer firms in the United States. *See* About FINRA, https://www.finra.org/about (last visited June 30, 2021). "The Securities Exchange Act requires that a broker-dealer be a member of a registered 'national securities organization,' and FINRA is the only extant registered 'national securities association,'" since its formation in 2007. David R. Burton, *Reforming FINRA*, The Heritage Foundation

BACKGROUNDER (Feb. 1, 2017). While FINRA is a "self-regulatory organization," the SEC is responsible for oversight of FINRA. *Id*.

FINRA's budget is "nearly two-thirds the size of the SEC's budget" and FINRA has "staff numbering more than 80 percent that of the SEC, but it is not a government agency. *Id*. While it serves a governmental function, "it is not subject to any of the normal transparency, regulatory review, or due-process protections normally associated with government," like "the notice-and-comment provisions of the Administrative Procedures Act, the Freedom of Information Act, the Regulatory Flexibility Act, the Sunshine Act, the Paperwork Reduction Act, or cost-benefit-analysis requirements." *Id*. Importantly, "its rulemaking is generally done in private." *Id*. Therefore, when dealing with FINRA, "the many protections afforded to the public when dealing with government are unavailable." *Id*.

Where the SEC failed to promulgate rules and regulations as Congress provided it should do in 15 U.S.C. § 78j, FINRA has made detailed and specific rules. For example, FINRA Rule 2111 defines "Suitability," which provides that a broker "must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile." FINRA Rule 2111. The FINRA supplemental material to Rule 2111.05(c) defines suitability further:

> Quantitative suitability requires a member or associated person to have a reasonable basis for believing that a series of recommended transactions, even if suitable when viewed in isolation, are not excessive and unsuitable for the customer when taken together in light of the customer's investment profile, as delineated in Rule 2111(a). No single test defines excessive activity, but factors such as the turnover rate, cost-equity ratio, and the use of in-and-out trading in a customer's account may provide a basis for a finding that a member or associated person has violated the quantitative suitability obligation.

FINRA Rule 2111.05(c). This detailed rule provides guidance regarding how excessive trading, or churning, is defined.

The judiciary has also filled in the gap left by the SEC in failing to promulgate rules relating to 18 U.S.C. § 78(j). Case law has developed three elements to a churning claim: (1) the trading was excessive; (2) the broker exercised control over the account; and (3) the broker acted with the requisite mental state. *See Mihara*, 619 F.2d at 821

The re-delegation of rulemaking authority from the SEC to FINRA and the judiciary is constitutionally problematic. The federal crime of churning is a judicial common law creation. The agency-like rules that actually define the parameters of churning are promulgated by a private entity, FINRA. Therefore, the judiciary has exercised the law-making power of Congress and the nongovernmental entity FINRA has exercised the rulemaking power Congress delegated to the SEC. This re-delegation violates the separation of powers. *See Bowen v. Massachusetts*, 487 U.S. 879, 908 n.46 (1988) (noting that [t]he power of [administrative agencies] is legitimized by the technical expertise of [the] agencies") (internal citation omitted); *Welch v. United States*, 136 S. Ct. 1257, 1268 (2016) ("[O]nly Congress, and not the courts . . . can make conduct criminal."); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994) ("There is no federal common law of crimes . . . ."); *United States v. Apel*, 571 U.S. 359, 369 (2014); *see also Guedes v. BATFE*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in denial of writ of certiorari) ("[W]hatever else one things about *Chevron*, it has no role to play when liberty is at stake. Under our Constitution, [o]nly the people's elected representatives in the legislature are authorized to 'make an act a crime.'").

Moreover, recent Supreme Court developments would draw into question any judicially developed elements of churning that defer to agency standards. In *Kisor v. Wilkie*, the Supreme

Court revisited what it considered "mixed messages" on the scope of legitimate administrative expansion of regulations. 139 S. Ct. 2400, 2414 (2019); *see Pereira v. Sessions*, 138 S. Ct. 2105, 2120 (2018) ("The type of reflexive [administrative] deference exhibited in some of these cases is troubling" and "suggests an abdication of the Judiciary's proper role in interpreting federal statutes.") (Kennedy, J., concurring). The Court held that only a truly ambiguous regulation would be subject to administrative interpretation in the civil context, but, in the criminal context, any ambiguity would be resolved by the rule on lenity. *McNally v. United States*, 483 U.S. 350 (1987). The rule of lenity is "founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department." *United States v. Wiltberger*, 18 U.S. 76, 95 (1820). The Supreme Court has repeatedly applied the rule of lenity to narrow the scope of fraud and related statutes. *See McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016); *Yates v. United States*, 574 U.S. 528, 549 (2015); *Skilling v. United States*, 561 U.S. 368, 410-11 (2010). Any ambiguity regarding "churning" in the context of the underlying statute must be resolved in favor of lenity to the defendant.

Because the crime of "churning" has never been enacted by Congress and is instead a creature of administrative agencies, nongovernmental agencies, and the courts, and because the indictment in this case strayed even from the judicially-defined crime of churning, continued prosecution of this case would violate the Constitution. The indictment should be dismissed.

IV.     **The Indictment Must Be Dismissed Because The Charged Offense of "Churning" Is Unconstitutionally Vague and Prosecution For Such An Offense Would Violate Due Process.**

"The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that

flouts it 'violates the first essential of due process.'" *Johnson v. United States*, 576 U.S. 591, 596-97 (2015) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). A vague criminal statute runs afoul of the Due Process Clause when it (1) fails to provide sufficient notice that would enable ordinary people to understand what conduct it prohibits; or (2) encourages arbitrary and discriminatory enforcement. *United States v. Coutchavlis*, 260 F.3d 1149, 1155 (9th Cir. 2001) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). The Supreme Court has expanded on the unfairness and risks posed by vague statutes:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (footnotes omitted). Vagueness concerns are enhanced with statutes such as the criminal securities laws that impose potential punishment by incarceration. *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498-99 (1982).

The present case and its criminalization based on a "catch-all" clause involves the same type of due process concerns that the Supreme Court identified with statutory "residual clause." In *Chiarella v. United States*, the Court stated that the securities statute upon which the government relies, section 10(b), "is aptly described as a catchall provision." 445 U.S. 222, 234-35 (1980). In a series of three cases starting in 2016, the Court held that "residual clauses" in the Armed Career Criminal Act, 18 U.S.C. § 16(b), and 18 U.S.C. § 924(c) were void for vagueness. *United States v. Davis*, 139 S. Ct. 2319 (2019) (924(c)); *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) (16(b)); *Johnson,* 135 S. Ct. at 2557 (ACCA). In striking down the residual clauses, the Court stated that

reliance on the general provision violated fundamental rights and left to Congress the responsibility of specifying the prohibited conduct and mental element:

> [Vague statutes] hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct. When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.

*Davis*, 139 S. Ct. at 2323.

The core problems identified by the courts with the residual clauses are equally evident with the text of the "catch-all" securities law, as it applied to this case. In the residual clause cases, courts were required "to picture the kind of conduct that the crime involves in the ordinary case, and to judge whether that abstraction presents some not-well-specified-yet-sufficiently-large degree of risk." *Davis*, 139 S. Ct. at 2326 (quoting *Dimaya*, 138 S. Ct. at 1216); accord *Johnson*, 135 S. Ct. at 2557. To the same extent, the general language of the securities statute, in the context of purported churning, fails to delineate how normal trading is to be measured and the risks of undue loss created by the defendant's conduct.

The vagueness is manifest in the subjective standards of what constitutes "excessive" trading. In *United States v. Kozminski,* the Supreme Court held that this type of standard keyed to another's subjective response fails to put people of ordinary intelligence on notice of what is innocent or prohibited conduct. 487 U.S. 931, 949-50 (1988) (rejecting the government's argument that a statute criminalizing involuntary servitude should encompass psychological coercion because "the type of coercion prohibited would depend entirely upon the victim's state of mind"). Similarly, in *Coates v. Cincinnati*, the Court held an ordinance prohibiting "conduct annoying to persons passing by" unconstitutionally vague because it failed to put people on notice of what conduct was criminally "annoying." 402 U.S. 611, 614 (1971). Just as what could be considered

annoying to some and not to others, thus establishing no consistent standard by which the conduct could be evaluated, different people could disagree whether "catch-all" language included the defendant's conduct and mental state. *Id.*; accord *City of Chicago v. Morales*, 527 U.S. 41, 55-58 (1971) (striking on vagueness grounds an ordinance that prohibited loitering – that is, remaining in any one place with no apparent purpose – in the company of a gang member). Criminality must be defined by legislatively determined standards, not the subjective reaction of prosecutors and regulators.

Where the statute provides sufficient guidance, the securities laws pass due process muster. *See, e.g.*, *Salman v. United States*, 137 S. Ct. 420, 428 (2016). But as applied in the context of allegations of "churning," the relevant terms provide too little guidance and limitation, leaving the defendant with inadequate notice of the prohibited conduct and the government with too much unguided discretion regarding criminal enforcement. The indictment should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss counts 1-12 of the indictment.

Respectfully submitted on June 30, 2021.

/s/ Lisa Hay
Lisa Hay
Attorney for Defendant

Jessica Greenlick Snyder
Research & Writing Attorney
On the Motion