IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **JAMES W. MILLEGAN**, <br><br> Defendant. | Case No. 3:19-cr-00528-IM <br><br> **OPINION AND ORDER** |

Lisa Hay, Office of the Federal Public Defender, 101 SW Main Street, Suite 1700, Portland, OR 97204; Mark Middaugh, Middaugh Law, PLLC, 600 University Street, Suite. 3020, Seattle, WA 98101; Thomas Freedman, Pearl Law LLC, 333 SW Taylor Street, Suite 300, Portland, OR 97204. Attorneys for Defendant.

Seth D. Uram, Katherine A. Rykken, United States Attorney's Office, 1000 SW 3rd Avenue, Suite 600, Portland, OR 97204. Attorneys for the United States.

**IMMERGUT, District Judge.**

Defendant James W. Millegan is charged with 12 counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of Tax Evasion, in violation of 26 U.S.C. § 7201.[1] ECF 68. On May 24, 2021, Defendant filed his Motion to Suppress Evidence or, in the Alternative, for a

---

[1] The original indictment that preceded the superseding indictment charged Defendant with 12 counts of Investment Account Churning ("churning"), in violation of 15 U.S.C. § 78j(b) and Securities Exchange Commission ("SEC") Rule 10-b5. ECF 1.

*Franks* Hearing. ECF 42. On February 9, 2022, this Court held a hearing on Defendant's motion and allowed supplemental briefing based on Defendant's receipt of new discovery. ECF 65. On March 9, 2022, this Court heard additional arguments on Defendant's motion and denied Defendant's request for a *Franks* Hearing—as explained on the record. ECF 81. This Court addresses the remaining issues in Defendant's motion below.

Defendant moves this Court to suppress all evidence seized pursuant to a search warrant executed on November 15, 2017. ECF 42. Defendant argues that the warrant was defective because it was overbroad as to the tax charge and lacked probable cause for the crimes of churning and wire fraud. *Id.* at 1. Based on this Court's review of the pleadings and the arguments of counsel, this Court finds that the search warrant was not over broad and that there was probable cause to support the searches of Defendant's home and storage units for evidence of the crimes of churning and wire fraud, as well as the other crimes alleged in the search warrants. Accordingly, for the reasons set forth below, this Court DENIES Defendant's Motion to Suppress.

## BACKGROUND[2]

Federal agents executed a search warrant at Defendant's residence and several storage units on November 15, 2017. The search was authorized by Magistrate Judge Paul Papak based on an affidavit submitted by Special Agent ("SA") Jason Nix of the Internal Revenue Service-Criminal Investigation. ECF 50-1 at ¶ 9. The affidavit averred that SA Nix had probable cause to believe that Defendant committed several crimes including tax evasion, wire fraud, manipulative and deceptive devices (investment account churning), and bankruptcy fraud. *Id.* at ¶ 1.

---

[2] The following facts are taken from Defendant's Motion to Suppress, ECF 42, and SA Nix's Affidavit, ECF 50-1. This Court will note where there is a significant dispute about issues of fact.

**A. The Tax Evasion Investigation**

In 2015, after Defendant had engaged in years of ongoing communications with the Internal Revenue Service ("IRS") to resolve an existing tax debt, the IRS initiated a criminal investigation into Defendant. *Id.* at ¶ 7. In the warrant affidavit, SA Nix averred that Defendant evaded the payment of his personal tax liability by making false statements to the IRS and using bank account transfers to conceal his income. *Id.*

Between July 2009 and December 2015, Defendant allegedly used bank accounts in the names of other businesses to conceal assets from the IRS. *Id.* at ¶ 39. SA Nix compiled information about these bank accounts, including their names, the institutions where they were held, the dates they were opened, the dates money transfers began, and the total amounts he believed were moved through each account. *Id.* SA Nix noted that Defendant moved $7,005,272.92 through these accounts, but typically did so by depositing and then withdrawing or transferring the funds within a couple of days in order to hinder the IRS's ability to levy the funds. *Id.*

SA Nix stated that during the collection process, Defendant provided financial information to the IRS which constituted false statements. *Id.* at ¶ 40. This included the omission of the pertinent bank accounts connected to entities he controlled and the transfers that were made to these accounts. *Id.* at ¶ 40(a). Defendant admitted that the reason he did not keep assets in his own bank account was because of the many IRS levies. *Id.* at ¶ 41. While Defendant claimed that he did not have sufficient cash flow to pay his tax debt, his bank account activity showed that between March 05, 2012 and January 25, 2015, he had moved at least $3,569,049.63 through his accounts. *Id.* SA Nix also stated that Defendant transferred money from his firm, J.W. Millegan, Inc. ("JWMI"), into another entity, Carlton LLC, through a lease agreement

scheme that allowed Defendant to escape IRS levies. *Id.* at ¶ 42.

SA Nix stated that Defendant employed a law firm to assist with the preparation and filing of his tax returns for himself and his businesses, and that Defendant filed his tax returns every year from 2006 to 2016. *Id.* at ¶ 38. The affidavit contains a chart indicating that Defendant paid some of his taxes that were due. *Id.* SA Nix did not allege that Defendant misstated his income on his tax return filings.

## B. The Churning Investigation

According to SA Nix's search warrant affidavit, in August 2016, the United States Attorney's Office for the District of Oregon received a referral from the Oregon Division of Financial Regulation ("ODFR") concerning information that Defendant, in his capacity as a broker-dealer for JWMI, had defrauded clients through the excessive use of commission generating trades—known as "churning."[3] *Id.* at ¶ 6. ODFR had gathered information from JWMI clients via interviews and questionnaires. *Id.* at ¶ 30. This information included recollections of the clients' interactions with Defendant, what they believed their recorded investment objectives were, and their level of investment sophistication and experience. *See id.* at ¶ 30(a)–(h). These clients—many of whom later moved their accounts—expressed a belief that

---

[3] Citing 15 U.S.C. § 78j(b), SA Nix's affidavit included the statute prohibiting "manipulative and deceptive devices"—also known as investment account churning:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . .

*Id.* at ¶ 22.

PAGE 4 – OPINION AND ORDER

they had lost money because of Defendant's trading decisions and that Defendant's commission fees were too high. *Id.* at ¶ 30(a)–(e), (h). One client was advised by other brokerage firms that Defendant's fees were excessive. *Id.* at ¶ 30(a). Another client was warned by an acquaintance that after taking a look at the accounts, "he had never seen such an egregious strategy." *Id.* at ¶ 30(c).

The referral also noted that Defendant and JWMI were involved in a Financial Industry Regulatory Authority ("FINRA") arbitration as a result of a claim that Defendant and JWMI engaged in practices, such as excessive trading and churning of their client accounts, that resulted in excessive commission fees. *Id.* at ¶ 4. After an evidentiary hearing, the arbitration panel found in favor of the claimants in September of 2016. *Id.* at ¶ 4. Defendant subsequently closed JWMI. *Id.* at ¶ 4.

**C. The Search Warrant Affidavit**:

On November 13, 2017, SA Nix submitted an affidavit in support of a request for three warrants to search Defendant's residence in McMinnville, Oregon, and three storage units, also located in McMinnville. ECF 42 at 7. This affidavit was attached to the application for the search warrants and was incorporated by reference. Within this affidavit, SA Nix avers that there was "probable cause that [Defendant] committed federal offenses to include Wire Fraud, Manipulative and Deceptive Devices (investment account churning), Bankruptcy Fraud, and the Evasion of Payment of his personal income tax." *Id.* at ¶ 20. He also stated as follows:

> [T]here is probable cause that financial business records necessary to prove his fraudulent investment activity, false bankruptcy statements, and affirmative acts of evasion of payment as set forth in Attachment B are being maintained and stored and will be found in:
>    1. [Defendant]'s residence/office of Woodworth Contrarian – 624 NE 2nd Street, McMinnville, OR 97128
>    2. McMinnville Self Stor – 2600 NE Lafayette Avenue, Unit #B168, McMinnville, OR 97128

PAGE 5 – OPINION AND ORDER

> 3. Your Public Storage – 1500 Lafayette Avenue, Units #2020 and #G148, McMinnville, OR 97128

*Id.* (footnote omitted).

Attachment B included the list of items to be seized, spanning the time period of "January 1, 2009 to present." *Id.*, Att. B at ¶ 1. The warrant authorized seizure of items related to Defendant, his wife, and his son. *Id.* Attachment B also authorized seizure related to various entities: Millegan Brothers, JWMI, Carlton LLC, Pilates For Parkinson's, Woodworth Contrarian Stock and Bond Fund LLP, Wallace Bridge, Eudora W Millegan Trust, Maolagain LLC, Woodworth Contrarian Advisors LLC, and Woodworth Contrarian Management LLC. *Id.* Attachment B authorized a search, seizure, and examination of all records including "[c]omputers and digital or electronic storage media" and other items related to digital devices. *Id.* at ¶ 15.

## STANDARDS

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Jones*, 565 U.S. 400, 404 (2012) (internal quotations omitted). The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. *Simmons v. United States*, 390 U.S. 377, 389–90 (1968). To support the issuance of a search warrant, an affiant must present evidence that gives the judge a "'substantial basis' for concluding probable cause existed" based on the totality of the circumstances. *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) (alterations omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)); *see also United States v. Weber*, 923 F.2d 1338, 1343 (9th Cir. 1990) (citing *Gates*, 462 U.S. at 238 (explaining that there need not be direct evidence of the specific alleged crime to

create probable cause, but there must be a "substantial basis" for the finding).

This test requires a "common sense determination that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Mendonsa*, 989 F.2d 366, 368 (9th Cir. 1993) (quoting *Gates*, 462 U.S. at 238); *see also United States v. Seybold*, 726 F.2d 502, 503 (9th Cir. 1984) (citing *Gates*, 462 U.S. at 238) (explaining that the totality of the circumstances test requires a reviewing court to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place" (alteration in original)). While a court is free to draw "reasonable inferences" from the materials supplied to it, *see Gates*, 462 U.S. at 240, "all data necessary to show probable cause . . . must be contained within the four corners of a written affidavit given under oath." *United States v. Anderson*, 453 F.2d 174, 175 (9th Cir. 1971); *United States v. Hove*, 848 F.2d 137, 139–40 (9th Cir. 1988) (probable cause determination must be based solely on information within the affidavit). "[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984); *see also United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir. 1986) (noting that "[a] magistrate's determination of probable cause to issue a warrant is treated with great deference"). Nevertheless, conclusory statements regarding the affiant's beliefs are no substitute for facts the court can meaningfully evaluate. *Underwood*, 725 F.3d at 1082–83 (collecting cases).

## DISCUSSION

**A. The Search Warrant Was Not Overbroad**

Defendant argues that the warrant was impermissibly overbroad because the information

PAGE 7 – OPINION AND ORDER

in SA Nix's affidavit went beyond the parameters of the government's investigation of Defendant's alleged evasion of tax payment. Specifically, Defendant claims that the warrant contained boilerplate language and irrelevant information pertaining to evasion of tax *assessment* conduct that is not germane to the evasion of tax *payment* conduct alleged by the Government. ECF 42 at 2. This Court finds Defendant's argument unpersuasive because the information that is the subject of Defendant's objection had no practical impact on the scope of the warrant.

"The Fourth Amendment requires that a warrant particularly describe both the place to be searched and the person or things to be seized." *United States v. Smith*, 424 F.3d 992, 1004 (9th Cir. 2005) (citation omitted). "The purpose of the breadth requirement is to limit the scope of the warrant by the probable cause on which the warrant is based." *Id.* (citations and internal quotation marks omitted). Here, Defendant claims that paragraphs 15 and 17 of SA Nix's affidavit contain information that is not relevant to the alleged evasion of payment of income taxes. Instead, the "boilerplate recitations" in these paragraphs relate to evasion of tax assessment. In paragraph 15, SA Nix discussed the need to identify "all assets and taxable income sources"—including "financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, etc."—in order to "accurately determine federal income tax filing requirements and to reconstruct total income, adjusted gross income and taxable income." ECF 50-1 at ¶ 15. Similarly, in paragraph 17, SA Nix stated:

> Evidence of a defendant's expenditures, asset accumulation, and financial lifestyle is often necessary to reconstruct income, expenses, taxable income and federal income tax. The source and application of funds analysis focuses on a suspect's sources of funds and expenditures during the time period of the purported failure to file tax returns.

*Id.* at ¶ 17.

PAGE 8 – OPINION AND ORDER

Defendant claims that this information "broadened the scope of the warrant beyond the factual information [SA] Nix provided, permitting seizure of items beyond any established probable cause." ECF 42 at 13. But Defendant has failed to explain how the scope of the search was in fact broadened. As the Government persuasively argues, Defendant's claim of overbreadth is undercut by the reality that the categories of evidence identified in Attachment B of the affidavit are also evidence of evasion of payment. ECF 48 at 8. Further, investigations into financial crimes often involve documents and patterns of conduct that may overlap with multiple different offenses.[4] For example, it is not the case that information about Defendant's "financial lifestyle" is irrelevant in an evasion of payment investigation. Indeed, that evidence is relevant to showing that Defendant does have access to funds but is willfully diverting those funds from the IRS. Moreover, evidence of assets and expenditures is relevant to show motive for the alleged financial crimes and what Defendant did with the proceeds earned from the alleged churning activity and wire fraud. As argued by the Government, this type of information can help the IRS identify and trace the commission money at issue. *Id.* at 7.

Defendant cites *United States v. Weber* in support of the proposition that when an "'affidavit [is] not drafted with the facts of this case or this particular defendant in mind,' the testimony is meaningless and cannot establish probable cause." ECF 42 at 13 (quoting *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990)). While the Ninth Circuit in *Weber* did find that the warrant was overbroad, it did not do so simply because the expert affidavit contained a few extraneous facts. Rather, the court noted that the expert testimony in the affidavit was "foundationless" and "consisted of rambling boilerplate recitations designed to meet all law

---

[4] Defendant was being investigated for other offenses including "Wire Fraud, Manipulative and Deceptive Devices (investment account churning), [and] Bankruptcy Fraud." ECF 50-1 at ¶ 20.

enforcement needs." *Weber*, 923 F.2d at 1345. This is a far cry from SA Nix including a few lines of information which only indirectly relate to the evasion of payment charge at issue.[5]

Unlike the affidavit in *Weber*, which the court chided as not "conscientiously drafted" or "tailored to what [the expert] knew about [the] Defendant," *id.*, SA Nix's 56-page affidavit provides detailed information that is directly connected to an evasion of payment charge. Those few sentences or portions of sentences that pertain exclusively to an evasion of tax assessment charge have a de minimis impact on the scope of the warrant. Adopting Defendant's argument would put this Court in the untenable position of having to suppress evidence every time an affidavit includes information not directly relevant to the charge at issue. This Court sees no reason to constrain a law enforcement affiant from providing additional contextual information especially in complex financial crimes cases. *See United States v. Flowers*, No. 316CR00035SLGSAO, 2016 WL 8679285, at *7 (D. Alaska Sept. 23, 2016), report and recommendation adopted, No. 3:16-CR-00058-SLG, 2016 WL 6471412 (D. Alaska Oct. 31, 2016), aff'd, 761 F. App'x 779 (9th Cir. 2019) (noting that even when information in the search warrant affidavit "may not stand on its own as [a] substantial bas[is] for probable cause," the information can provide a magistrate judge with "additional contextual information for consideration").

**B. The Search Warrant Did Not Lack Probable Cause with Respect to the Churning Counts**

Defendant also claims that SA Nix's affidavit was not sufficient to establish probable cause for the churning offenses because it contained "disconnected facts," "omissions," and

---

[5] The only line that is actually irrelevant is Defendant's "purported failure to file tax returns." ECF 50-1 at ¶ 17.

PAGE 10 – OPINION AND ORDER

"misleading statements." ECF 42 at 14. Even to the extent that the affidavit contained information that could have been presented in a clearer manner, this Courts finds little to suggest that the warrant lacked probable cause for the churning offenses.

Whether churning occurred is a question that considers the following three factors: (1) excessiveness of trading in view of investment objectives; (2) control of the accounts; and (3) the account executive's intent or reckless disregard. *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 530 (9th Cir. 1986). Excessive trading is evaluated by:

> examining risk, comparative suitability, and trading patterns. Suitability is apparent only by comparison with other possible investments. To determine whether the investments are suitable, one must know the spectrum of possible investments to which the ones in issue are compared. The significance of statistical measurements of account activity, such as the turnover rate, is apparent only in comparison to activity in other accounts.

*Id.* at 530.

Defendant's argument appears to contest only the first factor—excessive trading in view of investment objectives. Specifically, Defendant takes issue with SA Nix's presentation of the quantitative evidence of churning which he claims paints a misleading picture of the standards used to evaluate churning. According to SA Nix, two types of calculations—turnover rate and commission-to-equity—are used to support claims of excessive trading and disregard for client interests. ECF 50-1 at ¶ 32–33. Here, SA Nix calculated a 2.85 turnover rate and a 10.1% commission-to-equity ratio. *Id.* at ¶ 35. He then concluded that these results were within the bounds of what could be considered indicative of churning. SA Nix cites the work of expert Dr. Craig McCann who "recommends that where the Turnover Ratio is above 2 and the Commissions to Equity Ratio is above 2 or 3% churning is likely taking place." *Id.* at ¶ 33.

Defendant claims that SA Nix misrepresented the methodology for calculating churning and intentionally omitted more exacting turnover and commission-to-equity standards. ECF 42 at

PAGE 11 – OPINION AND ORDER

22. Citing an SEC investor alert published in January of 2017 that provided the churning standards used in prior SEC complaints, Defendant notes that a turnover rate of 6 or a commission-to-equity ratio in excess of 20% is indicative of churning. *Id.* Defendant claims that SA Nix knew or should have known about these 2017 SEC standards and failed to provide the Magistrate Judge with this information. ECF 67 at 6. According to Defendant, this had the effect of usurping the Magistrate Judge of his duty to conduct an independent evaluation of the churning evidence. ECF 42 at 22.

Defendant's argument is flawed for two central reasons. First, there is no universal quantitative standard for determining that churning has occurred. This means that while the turnover rate and commission-to-equity ratio calculated by SA Nix are lower than the SEC standards cited by Defendant, that does not mean that SA Nix's standards are per se invalid. Defendant would prefer that this Court adopt a bright-line test that would exonerate any defendant whose turnover rate and commission-to-equity ratio fall below the SEC's higher standards. But as the Ninth Circuit has stated, "there is no clear line of demarcation" for establishing churning. *Mihara v. Dean Witter & Co.*, 619 F.2d 814, 821 (9th Cir. 1980).[6]

Even though Dr. McCann's standard is lower than the standard used by the SEC and other courts, Defendant has not identified any binding precedent that would have required SA Nix to adopt one standard over the other. Defendant has also not provided any persuasive argument why Dr. McCann's methodology is inherently flawed or should otherwise be rejected. Quite the contrary, Dr. McCann's research had been cited by ODFR in its referral letter to the

---

[6] Defendant's own brief acknowledges the lack of a universal churning standard. ECF 42 at 21. Because it is undisputed that no universal standard exists, this Court declines to endorse Defendant's argument that SA Nix's failure to cite Defendant's preferred churning standards warrants relief.

United States Attorney's Office. ECF 50-1 at ¶ 33. Thus, Defendant's argument boils down to a difference of opinion among experts. While deliberate intent to deceive or reckless disregard for the truth can be inferred from the omission of material facts that would have negated probable cause, the "omission rule" does not require that the affidavit negate every possible theory that would controvert the affiant's good faith assertion of probable cause. *United States v. Craighead*, 539 F.3d 1073, 1081 (9th Cir. 2008).

Second, SA Nix's affidavit actually contains much of the information that Defendant claims was omitted. Contrary to Defendant's characterization of the affidavit, SA Nix did in fact present a full picture of the different churning standards at play. Even though SA Nix relied on Dr. McCann's framework—which included lower benchmarks for turnover rate and commission-to-equity ratio—the affidavit also acknowledged that higher turnover rates provided more definitive evidence of churning and that a turnover rate of 2 was merely "suggestive" of excessive trading as compared to a turnover rate of 6, which was considered "conclusive" of churning. ECF 50-1 at ¶ 32. In fact, the affidavit provided information about an October 2000 churning case where an SEC expert testified that for a conservative investor,[7] a turnover rate of 4 or 6 could provide more compelling evidence of excessive trading. *See* ECF 50-1 at ¶ 32. SA Nix's affidavit accurately presented evidence that higher turnover rates provide more definitive evidence of churning and that a turnover rate of 2 is not presumptive of churning.

---

[7] Defendant claims that because the ratios calculated by SA Nix do not apply to all of the accounts for which he provided interviews, this lack of overlap means that the evidence is somehow irrelevant. *See* ECF 42 at 17. Defendant admits that there is overlap with respect to client E.A. However, he argues that E.A. had a moderate investment approach—as opposed to a conservative approach—and thus SA Nix's calculations are not applicable to him. *Id.* But again, Defendant attempts to magnify a mere lack of clarity in the affidavit into a larger error. While the 2000 SEC expert discussed the standards for a conservative investor, Defendant has not adequately explained why these standards cannot be considered to assess the accounts of investors with less conservative trading approaches.

PAGE 13 – OPINION AND ORDER

This record does not demonstrate that SA Nix intended to mislead the Magistrate Judge, particularly when he took pains to provide the Court with information that had the potential to undermine his case. Thus, even though SA Nix did not mention the 2017 SEC investor alert standard by name, he provided the Court with effectively similar information. Moreover, it is not clear what the addition of this 2017 SEC investor alert information would have changed about the Court's review of the affidavit. The 2017 SEC information notes that the presence of the higher measurements—a turnover of 6, or a commission-to-equity ratio in excess of 20% — are "indicative" of excessive trading. It does not state that a turnover rate as low as 2 or a commission-to-equity as low as 10% are inherently unreliable. Nor does it state that an agent presented with these lower benchmarks "could not have concluded" that churning was indicated. ECF 67 at 7.

Further, a magistrate judge presented with SA Nix's evidence could easily piece together that the higher the turnover rate and commission-to-equity in a case, the higher the likelihood of wrongdoing. "In assessing probable cause, [a court] take[s] into account reasonable inferences." *United States v. Struckman*, 603 F.3d 731, 740 (9th Cir. 2010). The Magistrate Judge could also rely on SA Nix's expertise as an experienced financial crimes agent. *Seybold*, 726 F.2d at 504 ("We have repeatedly found the opinions of experienced law enforcement agents highly important in making probable cause determinations."). Here, the Magistrate Judge considered SA Nix's calculations and the standards at issue, along with the other facts presented in the affidavit, and arrived at the conclusion that probable cause existed.

While Defendant takes issue with SA Nix's presentation of the quantitative churning standards, this evidence does not exist in a vacuum. Rather, there is additional evidence that supports probable cause. The affidavit includes information from ODFR which shows that

Defendant was not acting in accord with his clients' risk tolerances and that clients were leaving him. ECF 50-1 at ¶ 3. ODFR noted that between January 2012 and October 2015, Defendant's average trade volume was 931 trades per month. *Id.* at ¶ 37. IRS records show that between 2006 and 2014, Defendant claimed $7,658,686 of personal income from JWMI, a firm that only had 86 households as clients. *Id.* SA Nix also stated that between 2012 and 2016 JWMI bank records found that average total client holdings between 2012 and 2016 were $10,985,231—with a high of $17,539,418. *Id.* The affidavit notes that during this time period, Defendant needed funds to develop a high end one hundred million dollar equestrian center. *Id.*

Additionally, a September 2016 decision from a FINRA arbitration panel involving some of Defendant's clients found that the claimants had established the elements of churning. *Id.* at ¶ 4. JWMI later closed as a result. *Id.* SA Nix also provided the details of interviews with Defendant's clients who were suspicious of his trading practices. One client, H.H., felt that Defendant was making trades solely to generate trading fees for himself. *See id.* at ¶ 30(b). H.H. claims that when he asked Defendant to provide him with records about his fees and the amount of money he invested, Defendant refused. *Id.* Other clients were even warned that they needed to find a different broker. For example, one of Defendant's clients, E.A., left Defendant in February 2015 after he lost $100,000, paid $50,000 in fees to Defendant, and had two brokerage firms tell him that the fees were excessive. *Id.* at ¶ 30(a). Another client, B.W., was told by an acquaintance that Defendant's trading strategy was "egregious" and that B.W. needed to get away from Defendant. *Id.* at ¶ 30(c). B.W. reported that when he asked Defendant about the growing commission charges and why he was trading so much, Defendant dismissed his concerns. *See id.*

The task of a court reviewing a warrant is not to conduct a de novo review of a magistrate

judge's decision. *Upton*, 466 U.S. at 733. Instead, the standard is whether, taken in its entirety, the evidence presented in the warrant application provided a substantial basis to support a magistrate judge's finding of probable cause. *Id.* Taking into account the churning analysis, the FINRA arbitration panel decision, and the ODFR investigation, there are multiple grounds for this Court to find that the Magistrate Judge had a substantial basis for concluding that probable cause existed. Further, this Court is mindful that in its role as a reviewing court, "preference should be given to the validity of the warrant." *McQuisten*, 795 F.2d at 861.

**C. Defendant Is Not Entitled to a Hearing Under *Franks***

Defendant urges this Court to grant a *Franks* hearing because SA Nix's affidavit intentionally or recklessly contained false and misleading statements that were crucial to the Magistrate Judge's determination of probable cause of churning. ECF 42 at 20–21 (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). In *Franks v. Delaware*, the Supreme Court established the principle that a defendant is entitled to a *Franks* hearing only if he makes a two-fold showing. *Franks,* 438 U.S. at 155–56. First, he must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.*; *see also United States v. Saterstad*, 852 F. App'x 250, 251 (9th Cir. 2021). Second, the defendant must demonstrate that "the false or misleading statement was material, i.e., 'necessary to finding probable cause.'" *Id.* If the defendant is able to meet his burden by making these two showings by a preponderance of the evidence, the affidavit's false material will be set aside, and the remaining content will be judged to see if it is insufficient to establish probable cause. *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017); *see also United States v. Chesher*, 678 F.2d 1353, 1362 (9th Cir. 1982).

"False statements" extend to "omissions of material facts," and a defendant may challenge a warrant affidavit, although valid on its face, when it contains deliberate or reckless omissions of material facts. *United States v. DeLeon*, 979 F.2d 761, 763 (9th Cir. 1992). However, there is "a presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171. A mistake—even one made negligently—will not suffice. *Perkins*, 850 F.3d at 1116.

As this Court already explained on the record at the March 9, 2022 hearing held on the instant motion, Defendant is not entitled to a hearing under *Franks*. For the same reasons this Court rejected Defendant's arguments challenging the sufficiency of the churning evidence, this Court finds that Defendant cannot establish that SA Nix intentionally or recklessly made any false statements or material omissions —much less any that were misleading. This is fatal to Defendant's request for relief.

Defendant claims that the affidavit was presented in a way that could mislead the Magistrate Judge. But quite the opposite is true. The affidavit represents SA Nix's efforts to present a full picture of the evidence. For example, SA Nix provided information from the 2000 SEC expert who noted that higher turnover rates can provide greater certainty that churning occurred.[8] ECF 50-1 at ¶ 32. While Defendant complains that the standards referenced in the affidavit were insufficient, this dispute boils down to Defendant arguing that he is entitled to relief because one source of information disagrees with SA Nix's analysis. This Court does not find that Defendant's speculation about SA Nix's intent equates to the "substantial preliminary showing" of proof under *Franks*. *See Franks*, 438 U.S. at 170 ("The requirement of a substantial

---

[8] In the same vein, SA Nix also included two interviews with Defendant's clients who were neutral on whether their accounts were churned. ECF 50-1 at ¶ 30(f)-(g).

preliminary showing should suffice to prevent the misuse of a veracity hearing for purposes of discovery or obstruction.").

### D. The Good-Faith Exception Applies

Even if this Court found that the search warrant lacked probable cause, the good-faith exception to the exclusionary rule applies. In *United States v. Leon*, the Supreme Court set out an exception to the exclusionary rule for a search conducted in good faith reliance upon an objectively reasonable search warrant. 468 U.S. 897 (1984). The Government bears the burden of proving that officers relied on the search warrant "in an objectively reasonable manner." *United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007). On the whole, SA Nix's affidavit was thorough and accurate. Further, the United States Attorney's Office approved the warrant prior to it being signed by the Magistrate Judge. The Ninth Circuit has held that law enforcement's reliance on counsel is "critical" to a good faith finding. *United States v. Winsor*, 549 F. App'x. 630, 632 (9th Cir. 2013) (citation omitted). This Court finds that law enforcement's reliance on the search warrant was objectively reasonable and the good-faith exception should apply.

In four circumstances, the good-faith exception will not apply because reliance is per se unreasonable:

> (i) where an affiant misleads the issuing magistrate or judge by making a false statement or recklessly disregarding the truth in making a statement; (ii) where the magistrate or judge wholly abandons her judicial role in approving the warrant, acting only as a "rubber stamp" to the warrant application rather than as a neutral and detached official; (iii) where the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid; or (iv) where the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.

PAGE 18 – OPINION AND ORDER

*Crews*, 502 F.3d at 1136 (citing *Leon*, 486 U.S. at 923–26). Defendant identifies two exceptions to the good-faith rule which he claims apply here. First, Defendant claims that an agent cannot rely in good faith on a warrant by an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." ECF 42 at 23 (quoting *Leon*, 468 U.S. at 923). This is an exacting threshold by design because "[i]n the ordinary case an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921. As this Court has already explained, the affidavit contained numerous bases for the Court to "establish at least a colorable argument for probable cause." *United States v. Grant*, 682 F.3d 827, 836 (9th Cir. 2012) (internal quotations omitted) (quoting *United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006). Defendant contests the significance this Court places on evidence like the ODFR investigation and the interviews conducted with Defendant's former clients. Yet Defendant has failed to present any substantive argument that this evidence was somehow so fundamentally deficient that that relying on this evidence would be unreasonable.

Second, Defendant claims that the good-faith exception does not apply if the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." ECF 42 at 23 (quoting *Leon*, 468 U.S. at 923). But again, Defendant has not provided any evidence that the affidavit contained knowingly false or misleading information. While Defendant may quibble with aspects of the affidavit like the financial experts relied upon by SA Nix, this does not mean that SA Nix knowingly or recklessly presented false information. Accordingly, this Court finds that even if the warrant lacked probable cause, the good-faith exception to the exclusionary rule would apply.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress, ECF 42, is DENIED.

**IT IS SO ORDERED**.

DATED this 25th day of March, 2022.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge
